## THE CIAMPA EMILIA.

### THE CIAMPA EMILIA v. SOMERS et al.

(Circuit Court of Appeals, Third Circuit. December 1, 1892.)

COLLISION—TUGS AND TOWS—VESSELS AT ANCHOR.

A dredge anchored in the Delaware river, on a clear night, with lights properly burning, was struck by a ship in tow of a tug on a hawser. *Held*, on the weight of the evidence, that the collision was not due, as alleged, to a sudden change of course by the tug from the east to the west side of the dredge, but was caused solely by the fault of the ship in failing to follow the tug's course, which, from a point more than a mile away, was directed and steadily maintained to the westward of the dredge. 46 Fed. Rep. 866, followed.

In Admiralty. Libel by Frank C. Somers, owner of the steam dredge Arizona, against the ship Ciampa Emilia, (Francisco S. Ciampa, claimant,) for damages for a collision. The dredge was struck by the ship while the latter was in tow of the tug F. W. Vosburgh on a hawser. In answer to a petition by the claimant, the owners of the tug appeared as defendants, and the contest was between the two as to which was in fault. The owner of the ship libeled the tug in the district court for the eastern district of New York to recover damages sustained by the ship in the same collision,

and the tug was there held liable, (41 Fed. Rep. 57,) which decision was affirmed on appeal to the circuit court of appeals for the second circuit. See 1 U. S. App. 143, 1 C. C. A. 508, 50 Fed. Rep. 239. In the present case, however, the district court found that the ship alone was in fault, in that she failed to follow the course of the tug. 46 Fed. Rep. 866. Affirmed.

Charles C. Burlingham, (Wing, Shoudy & Putnam, on the brief,) for appellant.

Josiah A. Hyland, (Hyland & Zabriskie, on the brief,) for respondents, appellees.

Henry R. Edmunds, for Frank C. Somers, libelant, appellee.

Before ACHESON and DALLAS, Circuit Judges, and BUFFINGTON, District Judge.

ACHESON, Circuit Judge. This suit was brought by the owner of the steam dredge Arizona against the ship Ciampa Emilia to recover damages sustained by the dredge by reason of having been run afoul of and into by the said ship on the night of November 2, 1888, between the hours of 9 and 10 o'clock. The place of collision was Mifflin bar, in the Delaware river, a few miles below Philadelphia. The Arizona, with proper lights set and burning, was anchored about mid-channel, with head upstream. The width of the dredge was 34 feet. On either side there was a clear water space at least 250 feet wide, in which deeply laden vessels could safely navigate. At the time of the collision the ship was in tow of the steam tug F. W. Vosburgh, on a hawser about 250 feet long, bound for Philadelphia. The tide was flood, the night was clear, and lights were easily visible. The dredge was struck on the lower easterly corner by the bow of the ship. The libel charged that the collision was caused solely by the fault of the ship, and the incompetency, negligence, and careless management of those aboard of and in charge of her, who had abundant and timely warning of the presence of the dredge, and could and should have avoided her. The owner of the ship Ciampa Emilia petitioned the court to bring in the owners of the tug Vosburgh as codefendants, alleging that the collision was caused by reason of the fault of those in charge of and navigating the tug; and subsequently the owners of the tug appeared in the cause, and filed an answer.

The question of fact involved in this appeal is well presented in the following quotations from the said petition of the owner of the Ciampa Emilia and the answer of the owners of the tug. The petition alleges:

"Those on board of the ship first sighted the lights of the vessel, which proved to be the steam dredge Arizona, a little on the ship's port bow, distant upward of a mile. There was ample room for the tug to pass the dredge on either side. She directed her course so as to pass to the eastward of the Arizona and another dredge anchored just above the Arizona, and would have towed the ship by the dredges in safety had she kept the course which she was then on. Instead of doing so, the Vosburgh, when very near the dredge Arizona, took a rank sheer to port, and undertook to pass to the westward of the dredge. The ship instantly put her wheel hard astarboard, and went off to port several points. She was,

however, so close to the dredge at the time that she fetched up on one of the lines by which the dredge was anchored. This stopped her swing to port, and made her swing a little to starboard. The tug was then to the westward of the dredge, and the towing line ran across the dredge's deck. The tug kept on. and brought the ship into violent collision with the dredge, the ship striking the lower easterly corner of the dredge with the bluff of her port bow."

The answer avers:

"That before said tug reached said dredge, and at a distance of about two miles away, the pilot in charge of said tug sighted the lights of said dredge, and thereupon shaped his course to go to the westward of said dredge, on which side there was sufficient and ample room for said tug to pass by said dredge with said ship in tow with safety: that when said tug Vosburgh had shaped her course to pass to the westward of said dredge she was fully one mile below and to the southward of said dredge; that therefrom said tug proceeded on such course without deviation, and arrived opposite said dredge, and to the westward thereof about sixty or seventy yards; that when said tug had arrived about opposite said dredge, and off about sixty or seventy yards to the westward of said dredge, and on a course to pass clear of said dredge with her said tow, the said ship Ciampa Emilia took a sudden and rank sheer to the eastward, and took a course which brought the port bow of said ship into collision with the lower east corner of said dredge; and that by reason of said sheer said hawser between the tug Vosburgh and said ship was parted before said collision."

The learned district judge in the court below found the facts to be substantially as alleged in the above-quoted paragraph from the answer of the owners of the Vosburgh, and that the tug was blameless; that the collision could not have occurred had the Ciampa Emilia been properly steered to follow the tug; but that she was not so steered; and that when the tug had reached a position opposite to and about 150 feet westwardly from the dredge, the ship, by reason of her departure from the course of the tug, and wholly by the fault and negligence of those on board of her and engaged in her navigation, was brought into collision with the dredge.

We have examined the proofs with great care, and the more so because in the case of Ciampa v. The F. W. Vosburgh, 41 Fed. Rep. 57, a suit in the district court of the United Sates for the eastern district of New York, growing out of this collision, negligence on the part of the Vosburgh was found, and there was a decree against the tug, and that decree has been affirmed by the circuit court of appeals for the second circuit. The F. W. Vosburgh, 1 U. S. App. 143, 1 C. C. A. 508, 50 Fed. Rep. 239.

We here meet that conflict of statement between those who were on board the ship Ciampa Emilia and those who were in charge of the tug Vosburgh which is so common in this class of cases. These two sets of witnesses respectively speak with equal positiveness in favor of their own vessel. But there are some collateral circumstances, which, we think, greatly break the force of the testimony of those who were on the ship. In the first place, none of those witnesses, save the lookout, was in a favorable position to see objects ahead, or to note accurately the movements of the Vosburgh. Then, if the lookout saw the dredge, he did not report its presence, and, in fact, the man at the wheel was in utter ignorance that any dredge was there until after the collision. Again, the master of the ship was altogether ignorant with respect to the navigation of the Delaware river, and so were all his crew. It is, too, disclosed that none of them understood the

usual signals of steam vessels when meeting and passing. Further-
more, very shortly before the collision, orders to the wheelsman were
volunteered .by one Fizzarotti, who had come aboard the ship to
deliver letters and solicit business. Fizzarotti's spontaneous inter-
ference with the navigation of the ship, and his declared reasons for
so doing, are so significant that we quote from his cross-examination:

"Question. You stated that you gave some orders to the wheelsman, did you?
Answer. Yes; told him to look out for the steamboat. I said, 'She is going to
change her course.' After his signal, I said, 'Watch out, and follow him.' Q.
How did you come to do that? A. Why, because the captain of the ship —
These people don't know the signals of the steamboats. They don't know them,
and they don't speak English. That is the reason I told him. There was no
pilot aboard, or anybody else, to tell him. Q. You told him because you saw
they were not doing what they ought to do; is that it? A. Yes, sir. By the
Court: Q. What did you say then? A. To follow the steamboat. Q. What an-
swer did you give to this question? A. He asked me the question, if I thought it
was best to do what they done, and I told him, 'Yes.' There was no pilot aboard.
That is the question he asked of me. By Mr. Hyland: Q. You saw that they didn't
understand the signals? A. Yes, sir. Q. And you saw that the ship was not fol-
lowing the tug, and then you told them to put their wheel to starboard? A. So
as to follow the tug. Q. Because they were not doing it? A. That is what I
mean to say,—to give the instructions for them to steer after the tug."

True, on his re-examination, Fizzarotti says that when he spoke to
the man at the wheel the ship was following the tug, but it is hard to
believe that he interfered unless there was some urgent occasion for
his so doing.

Turning now to the Vosburgh, we find that there were on board
of her two experienced pilots, who were perfectly familiar with the
Delaware river, and accustomed to navigate it, namely, Long, who
was engaged for this trip, and Cahill, who was also the master and a
part owner of the tug. They were both in the pilot house when the
collision occurred, and had been there some considerable time be-
fore. They had previous knowledge that the dredge was at Mifflin
bar, and they sighted her lights when two miles away. Their nar-
ratives are clear and circumstantial. They both state that at a point
not less than one mile below the Arizona the course of the Vos-
burgh was shaped to pass to the westward of the dredge, and was not
thereafter changed or varied; that, pursuing that course, the tug
was in the act of passing from 150 to 200 feet to the westward of
the dredge, and was about abreast thereof, when the ship Ciampa
Emilia suddenly sheered off to the eastward, going the whole length
of the hawser, and striking with her bow the stern of the dredge
at the starboard corner. There was a third witness of the collision
on the tug, namely, John A. Martin, a licensed harbor pilot, who on
this occasion was acting in the capacity of a deck hand on the Vos-
burgh. He was on the deck of the tug when the collision happened.
His testimony fully confirms that of Long and Cahill. That these
three eyewitnesses of the disaster could be mistaken is incredible,
and, if their account of the matter is rejected, it must be on the
ground that they have willfully falsified; and, indeed, the latter is
the argument here pressed upon us.

In dealing with the appellant's theory that the catastrophe was
brought about from the attempt of the tug to pass from the east to

the west of the dredge when so near that the ship following the tug fetched up upon one of the lines by which the dredge was anchored, there naturally arises the question, why should the pilots on the Vosburgh have made such a movement? The allegation involves a great improbability. No reason for a sudden change in the course of the tug from the eastward to the westward of the dredge appears, and none is even suggested. On the other hand, there is good ground for the hypothesis that the wheelsman on the ship mistook the lights on the dredge for those of the Vosburgh.

But there is much positive evidence favorable to the Vosburgh, which comes from disinterested persons, whereas the ship's side of the case rests exclusively upon the testimony of those who were aboard of her.

First, the steamboat Canonicus was descending the river, and, when about opposite the dredge, and from 200 to 300 feet to the eastward thereof, interchanged signals with the Vosburgh, then about one mile below. The Canonicus blew two whistles, which were promptly answered by the Vosburgh. The captain and pilot of the Canonicus both testify that upon the giving of the signals the red light of the Vosburgh was immediately shut out; that the vessels met and passed each other a quarter of a mile or more below the dredge; that the Vosburgh was then on their starboard side, distant about 500 feet, and was on a course which would take her to the westward of the dredge; and each of these witnesses states that after the boats thus passed he looked back, and saw that the tug kept on her course to the westward of the dredge.

Again, the tugboat M. W. Hunt had taken Fizzarotti down to meet the Ciampa Emilia, and after he boarded her the Hunt accompanied the ship upstream, keeping on her port side, but not attached. Dasey, the master, and Tees, the cook and deck hand of the Hunt, were in her pilot house. Their testimony throughout corroborates the witnesses who were on the Vosburgh. Dasey and Tees were eyewitnesses of the collision, and their account of the occurrence tallies with that of the Vosburgh's pilots. But it appears that soon after the collision an ex parte affidavit in the interest of the ship was procured from Dasey, in which it is stated that the Vosburgh made a rank sheer to port. Being confronted with this affidavit on his cross-examination, Dasey declared that he was misunderstood in that particular by the person who took down his statement, and there the matter was allowed to rest. Now, undoubtedly, this affidavit tends to discredit Dasey, and his testimony is to be most carefully scrutinized and cautiously received. Nevertheless, under all the circumstances, and in view of the other independent evidence, we are not prepared to say that it is not to be taken into consideration at all. So far as we can see, the man has no interest whatever in this controversy. But, at any rate, this affidavit does not affect Tees, and we are not able to discover in the undisputed facts anything tending to discredit him.

But this record contains the testimony of two other persons who saw the collision from standpoints favorable to correct observation,

namely, Sammons, the watchman on the dredge Arizona, and Hudson, the watchman on the dredge Baltic, which was anchored a short distance above the Arizona, and a little to the westward thereof, the eastern side of the Baltic being on a line with the western side of the Arizona. Immediately before the collision Sammons went aft on his dredge. He says that the Vosburgh was then "off abreast of us, to the westward," and he noticed that the ship was fast approaching the dredge. Thereupon he hallooed to those aboard of her, and waved· a lantern, to warn off the ship. He says: "She was coming into us; looking as though she was going to run into us, which she did." "*I could see that she was coming head on.*" He states that the ship struck the dredge with such force that she broke all the lines by which the dredge was anchored except the starboard quarter line, and that she caught in that line "*after she struck us,*" and that she so caught by reason of the dredge being turned around by the force of the collision. Hudson states that he first noticed the lights of the Vosburgh when he supposed her to be a mile below the Arizona, and that she then hauled to the westward, showing both of her side lights, but afterwards she hauled further to the westward, and shut out from him her red light, and that "*she kept to the westward of the dredge all the time.*" When he first saw the ship she was showing her red light, and moving eastward, while the Vosburgh was moving westward; and he says: "The tugboat kept coming to the westward, and she (the ship) to the eastward; and after a bit she hauled up and showed both of her lights, and this time it was right over the top of the dredge that I saw them." "The ship hauled up, and I could see the lights over the dredge; and into the dredge she come. *She weren't following the tugboat at all.*" It is plain that the statements of these two watchmen are quite at variance with the allegations of the owner of the ship contained in his petition.

·After the most patient study of the whole case, our conviction is that the clear weight of the evidence is with the Vosburgh.

Therefore the decree of the court below is affirmed.